**PETER CRISPIN and HENRY JAMISON, Plaintiffs**

**v.**

**AMERICAN SAMOA GOVERNMENT and DOES I-V,
Defendants**

High Court of American Samoa
Trial Division

CA No. 3-91

May 21, 1992

Before RICHMOND, Associate Justice, LOGOAI, Associate Judge, and BETHAM, Associate Judge.

Counsel: For Plaintiffs, Roy J. D. Hall, Jr.
For Defendants, Richard Lerner, Assistant Attorney General

This is an action by which plaintiffs Peter Crispin and Henry Jamison seek damages against the American Samoa Government for property damage.

## FINDINGS

Plaintiffs jointly own a 26-foot Sea Ray Express motorboat. Plaintiff Crispin is also a co-owner of the Tool Shop, Inc., which has business premises on land in the Sen. Daniel K. Inouye Industrial Park at Tafuna, American Samoa, leased from defendant. Facilities of the Maintenance and Operations Division (M & O) of defendant's Department of Public Works are on land immediately adjacent to the northern boundary of the Tool Shop area. The two areas are separated by a 6-foot chain-link fence.

On Saturday, February 3, 1990, the motorboat was parked on a trailer at the west end of the Tool Shop building, next to the separating fence. It had been there for approximately two to three months in need of repair due to a blown head gasket. The trailer axle was also in disrepair. Thus, the motorboat was not readily movable from this location on this date. The motorboat had been parked at this point on many occasions before when it was taken out of the water.

Across from the motorboat, there was a shed that was next to the fence on the M & O premises. The shed covered various equipment parked in this area by defendant. Defendant constructed the shed in June or July 1988. Plaintiff Crispin told the workers that he thought the quality of the construction was not good work. They laughed. He also informed the head of the M & O Division about his opinion on the quality of the shed's construction. However, no alterations were made to the structure.

A storm with strong winds began to impact American Samoa on Friday, February 2, 1990. Plaintiff Crispin had heard by Friday evening that the storm might reach hurricane proportions. The Tool Shop opened for business Saturday morning, February 3. However, the storm was growing in strength, with strong gusts of wind, and all employees had been allowed to go home by noon.

Plaintiff Crispin and his wife remained at the premises past noon. Bill Maxey, a business person then operating at the Lumanai Corporation warehouse a short distance to the east in the Industrial Park, and his wife stopped by some time between noon and 12:30

61

p.m. At approximately 1:00 p.m., while the two couples were having coffee in the second-floor office of the Tool Shop at the west end of the building, Maxey and plaintiff Crispin saw the roof of the shed blow off in one piece and into and over the fence onto the motorboat.

At the time the shed roof was blown onto the motorboat, the winds generally came from a northeasterly direction. However, the Tool Shop building did not offer much protection to the area where the motorboat was located. The roof was still on the motorboat when plaintiff Crispin checked about 11:00 p.m. Saturday night. Another check between 2:00 and 3:00 a.m. Sunday, February 4, revealed that the roof had blown off the motorboat.

While the roof lay on the motorboat, the wind was banging the roof up and down against the motorboat. Plaintiff Crispin inspected the damage on Monday, February 5, 1990. It was extensive. Both starboard windows and their top and side frames were broken. One port window was also broken. The top awning and frame were destroyed. The cabin doors were damaged, and substantial interior water damage occurred. The front hatch was broken. The stern handrail was also broken, and other handrails were bent. The gel coat on the hull was extensively chipped. The estimated cost of repair is $4,300.

Akapo Akapo of the U.S. National Weather Service provided the official records of wind strength taken at the nearby Pago Pago International Airport during this storm, designated Hurricane Ofa. The winds were recorded until the Weather Service lost power about 6:00 p.m. on Saturday, February 3, 1990. The highest recorded wind on Saturday was 93 knots or approximately 107 miles per hour at 2:19 p.m. Between 12:30 and 1:30 p.m., the winds ranged from a low of 15 knots, or 17.25 miles per hour, to the strongest gust at 77 knots, or 88.55 miles per hour.

David Gianni, General Manager of the Architect and Engineering Division (A & E) of the Department of Public Works of defendant Government, testified to community building standards. At the time of Hurricane Ofa, the Uniform Building Code, Short Form, 1964 edition, was in effect. The shed would be rated under the Code as a "J" occupancy structure, which is a non-human occupied building with the least restrictions applicable to its construction. There would be no wind resistance restrictions. He had seen the shed before the storm and did not observe any violations of applicable construction

standards in the Code or of generally accepted standards in the community. The shed would not withstand the winds of Hurricane Ofa. He would have designed, if he had been involved in that phase, a more substantial shed for its intended purposes, which would have withstood 80 to 90 mile per hour winds, in light of safety considerations for adjoining property.

Hurricane Ofa caused severe damage throughout the Tafuna area. The Lumanai Development Corporation building, housing Bill Maxey's business, suffered extensive wall and roof damage at some point after the shed roof was deposited on the motorboat. Paul Dumas, a defendant Government employee with the Department of Education and a resident at the Government-housing complex about one-half mile to the east of the Tool Shop, testified to serious damage to units there. The winds were at their peak in that area late Saturday night and early Sunday morning. There was both structural damage, particularly to roofs, and considerable water damage inside the housing units.

Andy Smith, who is presently the Deputy Director of Public Works and was General Manager of the Civil Division when Hurricane Ofa struck, testified to several inspections during and after the storm. He inspected north-shore areas of the Island of Tutuila on Friday, February 2, where severe, wave-surge damage occurred. During the morning of Saturday, February 3, he checked on crews working at various damaged areas. These inspections were slowed by obstacles on the road requiring removal for vehicles to pass.

He returned to the M & O compound at Tafuna at 1:30 p.m. on Saturday, February 3. While there, this area was being struck by periods of heavy rains with intermittent strong winds. When he left for home about 3:00 p.m., he observed that a large section of the roof had blown off the Burns Philp lumber-yard building, which is south and across the street from the Tool Shop, into the adjacent Spencer Company warehouse. Banana trees and a breadfruit tree were blown down near his Government quarters in the Tafuna-housing area. The storm was then intensifying. By dark that evening, mango and other larger trees were down in this area.

After the storm, he observed extensive damage in the Tafuna area. Power poles were snapped and lines down. In the Industrial Park, the CBT Lumber warehouse had collapsed. Portions of the Burns Philp roof were blown away. Roofs at the Tropical Millwork

63

buildings were off. Metal skin at the GHC Reid facility was gone--likewise at the South Pacific Recycle premises. The McConnell-Dowell building had roof damage. The Ice, Inc. facility was severely damaged, as was the T & T compound. All of these structures are located in the vicinity of the Tool Shop.

Towards the Pago Pago International Airport, the Tafuna High School gymnasium had collapsed. Roofs of the airport shops were gone. One hangar was virtually destroyed, as were several warehouses. The Government's Office of Procurement facility in this area suffered severe skin and roof damage.

At the east end of the Industrial Park, there was substantial roof damage at the Vocational-Technical School adjacent to the Government-housing area. The roof of one Government-housing unit was destroyed. Other units had significant wind damage. Roofs and fences at the nearby Government Correctional Facility were seriously damaged.

The M & O compound was also heavily damaged. The heavy equipment shop skin was gone. The second floor of the materials laboratory was blown away.

He did not see any damage to the Tool Shop. The Lumanai Development Corporation warehouse was still intact Saturday afternoon, February 3. He believes most of the serious destruction in the Tafuna area occurred after 3:00 p.m. that afternoon and into the early morning the next day.

He also believes the CBT warehouse collapsed as a result of a rocking motion. He does not know whether faulty construction or strong winds, or both factors, caused or contributed to this action.

He has no personal knowledge of the manner of construction of the shed. He estimated its size at 35 to 40 feet long and 10 to 15 feet wide. However, he only saw it from a distance before the hurricane.

## DISCUSSION AND CONCLUSIONS

1.  Administrative Claim Prerequisite

Claims against the American Samoa Government for personal injury or property damage must be administratively submitted under the Government Tort Claims Act to the Attorney General for resolution before judicial action is instituted. A.S.C.A. § 43.1205. This prerequisite to suit is clearly jurisdictional by its own terms.

In this case, the pleadings implicitly show that plaintiff Crispin filed an administrative claim, which was rejected by the Attorney General. However, defendant Government's answer to the complaint denies this Court's jurisdiction over plaintiff Jamison's claim for lack of a prior, administrative claim. The Court sought but did not receive any specific details about plaintiff Crispin's administrative claim, specifically a copy of the claim and denial, to make an informed decision on the issue of plaintiff Jamison's standing based on the form and content of plaintiff Crispin's administrative claim.

A.S.C.A. § 43.1205 is an essentially precise counterpart of 28 U.S.C.A. § 2675 in the Federal Tort Claims Act. While there is no territorial implementing rule to A.S.C.A. § 43.1205 known to the Court, the federal rule at 28 C.F.R. § 14.3 provides:

§ 14.3 Administrative claim; who may file.
(a) A claim for injury to or loss of property may be presented by the owner of the property, his duly authorized agent, or legal representative.
. . . .
(e) A claim presented by an agent or legal representative shall be presented in the name of the claimant, be signed by the agent or legal representative, show the title or legal capacity of the person signing, and be accompanied by evidence of his authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian, or other representative.

Federal court decisions make applicable policy considerations clear. The administrative claim prerequisite, while jurisdictional, is not an arbitrary standard. One basic purpose is to focus the government on settling claims without litigation when settlement is appropriate. Another is to not obstruct judicial determinations on technicalities when the government is adequately apprised of the claim

65

it must face. See, as examples of claims involving representative capacities, *Locke v. United States*, 351 F. Supp. 185 (D.C. Haw. 1972); *Coe v. United States*, 502 F. Supp. 881 (D.C. Or. 1980); *Sky Harbor Air Serv., Inc. v. United States*, 348 F. Supp. 594 (D.C. Neb. 1972); *see generally* Annotation, *When is Claim Properly Presented to Federal Agency, Under 28 U.S.C.S. § 2675(a), for Purposes of Satisfying Prerequisite to Subsequent Suit Under Federal Tort Claims Act*, 73 A.L.R. Fed. 338 (1985).

Applying these principles in this case, the Court only knows, by way of evidence, that plaintiffs are in some legal manner co-owners of the motorboat and that plaintiff Jamison allegedly failed to file an administrative claim. Neither the claim or claims by plaintiffs nor the denial or denials by defendant, as the case may be, nor any other affirmative evidence on this issue, was presented. Thus, the Court declines to rule on the legal sufficiency or insufficiency of plaintiff Crispin's administrative claim on plaintiff Jamison's behalf.

On the other hand, defendant was aware of the plaintiffs co-ownership of the motorboat and was adequately prepared to defend this action. In this case at least, the interests of final determination of the issues with respect to all litigants outweigh the legal niceties of plaintiff Crispin's representative capacity for administrative-claim purposes. Therefore, we accept jurisdiction over plaintiff Jamison's claim. We also expect defendant to support more vigorously any asserted defects in the administrative-claim process in the future if it truly wants to rely on such defects in defense.

2. Motion to Dismiss under T.C.R.C.P. 41(b).

Defendant moved, pursuant to T.C.R.C.P. 41(b), for dismissal when plaintiffs completed presentation of their evidence, on the ground that upon the facts and the law plaintiffs had shown no right to relief. The Court opted to decline to render any judgment until the close of all the evidence.

T.C.R.C.P. 41(b) is precisely the same as Rule 41(b) of the Federal Rules of Civil Procedure (F.R.C.P.).[1] This Court looks to

---

[1] The operative provisions of F.R.C.P. 41(b) have recently been transferred to F.R.C.P. 52(c) with a new name: judgment on partial findings. This change is largely organizational, placing all provisions

the F.R.C.P. for guidance and must conform to them as closely as practicable. A.S.C.A. § 43.0201(a). The standard of proof on a motion to dismiss at the conclusion of a plaintiff's evidence is that plaintiff must prevail by a preponderance of evidence. *Willis v. Fai'ivae*, 10 A.S.R.2d 121, 141 (1989); J. Moore, J. Lucas, & J. Wicker, 5 *Moore's Federal Practice* ¶ 41.13[4], at 41-177 to 41-179 (1985); C. Wright & A. Miller, 9 *Federal Practice and Procedure* § 2371, at 224-25 (1971).

However, the Court is not obliged to rule on the motion at this point but may defer judgment until the close of all the evidence. This procedure amounts to no more than a refusal to enter judgment when a plaintiff completes his case-in-chief and does not preclude a later determination not altogether strictly consistent with postponement of the ruling. J. Moore, J. Lucas, & J. Wicker, *supra*, ¶ 41.13[4], at 41-179 to 41-180 (1985); C. Wright & A. Miller, *supra*, § 2371, at 222-23 (1971).

Having in its discretion elected to defer judgment until the close of all the evidence, the Court now turns to its decision based on the law applicable to the findings of fact above.

3. Defendant's Negligence

This case embraces the rights and obligations in tort by owners or other occupiers of land to persons outside of the premises. This area of the law has historically been slower to accommodate to the needs of modern society, or put otherwise, to balance the privilege to freely use one's land with due regard for others who may be adversely affected by those uses. W. Prosser & W. Keeton, *The Law of Torts* § 57 (5th ed. 1984); *Restatement (Second) of Torts* § 363 *et seq.* (1984); B. Witkin, *Summary of California Law*, Torts § 898 *et seq.* (9th ed. 1988); *see also* the informative discussion in *Sprecher v. Adamson Cos.*, 30 Cal. 3d 358, 636 P.2d 1121 (1981).

---

dealing with findings of fact and conclusions of law in a non-jury trial in one rule. However, it also broadens the scope of the rule in two respects. First, the motion is available to a plaintiff as well as a defendant. Second, it can be made at any time after the opposing party has been fully heard on an issue. It continues to give the court broad discretion to require issues to be tried in a particular sequence before having legal sufficiency tested by this motion.

Today it is widely accepted, however, in the context of the facts of this case, that a landowner or possessor of land is liable for creating or maintaining dangerous artificial conditions. *Restatement (Second) of Torts* §§ 364, 365; B. Witkin, *supra*, § 898. Defendant's duty is to cause no unreasonable risk of harm to others in the vicinity. W. Prosser & W. Keeton, *supra*, § 57.

There is no serious issue under the evidence in this case that defendant vicariously knew, through its employees responsible for the shed's construction, including at least one senior official, that the shed was of inferior quality. However, it is equally clear that the quality of the shed's construction met the minimum, statutory building requirements applicable to this type of structure. Therefore, it is concluded that defendant did not breach any duty owed to plaintiffs and was not negligent with respect to the construction of the shed.

Even if it were concluded that the shed was negligently constructed, perhaps due to a higher standard of care in light of the proximity of the shed to plaintiffs' adjacent premises and/or defendant's knowledge of the destructive force of hurricanes, liability does not follow. The evidence shows that a shed of this type reasonably constructed to withstand greater wind forces, under architect Gianni's design, probably would not have repelled hurricane winds in excess of 80 to 90 miles per hour. Recorded Hurricane Ofa winds reached 88.55 miles per hour in velocity at or about the time the shed's roof was blown onto plaintiffs' motorboat. Negligence of a landowner or land occupier is not a substantial factor proximately causing harm if the harm would have occurred despite the negligence of the landowner or land occupier. *Restatement (Second) of Torts* § 432(1). Thus, any negligence by defendant in the construction of the shed was not a proximate cause of plaintiffs' property damage.

We conclude that defendant was not negligent and Hurricane Ofa was the legal proximate cause of plaintiffs' property damage. Judgment will be entered in defendant's favor.

It is so ordered.